# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 97 C 3457 | **DATE** | 1/28/2002 |
| **CASE TITLE** | | Cloud Corporation vs. Hasbro Corporation | |

**MOTION:**    [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]    Enter Memorandum Opinion.  Judgment is entered in favor of Defendant Hasbro Corporation and against Plaintiff Cloud Corporation.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | **Document Number** |
| | No notices required. | | 2 number of notices | |
| ✓ | Notices mailed by judge's staff. | | JAN 29 2002 date docketed | |
| | Notified counsel by telephone. | | | |
| | Docketing to mail notices. | | docketing deputy initials | |
| ✓ | Mail AO 450 form. | | 1/28/2002 date mailed notice | |
| | Copy to judge/magistrate judge. | | | |
| ETV | courtroom deputy's initials | U.S. DISTRICT COURT CLERK 02 JAN 28 AM 11:41 FILED-ED Date/time received in central Clerk's Office | ETV mailing deputy initials | |

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| CLOUD CORPORATION, a Delaware corporation, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 97 C 3457 |
| HASBRO CORPORATION, a Rhode Island corporation, | ) ) ) | Judge Rebecca R. Pallmeyer |
| Defendant. | ) ) | |

## MEMORANDUM OPINION AND ORDER

When the market for Hasbro Corporation's ("Hasbro") aquarium toy suddenly dried up, one of its vendors was flush with packets of gel powder that Hasbro no longer needed. Plaintiff Cloud Corporation ("Cloud") argues that by directing it to make a change in the formula for the gel powder, Hasbro effectively ordered the larger number of packets that the new formula generated. Hasbro refused to take delivery of packets in excess of the amount it had ordered prior to the formula change, and Cloud brought this action for damages. Hasbro's refusal to pay for the extra packages, Cloud alleges, constitutes a breach of contract. Cloud asserts that it is entitled to the purchase price for the more than two million packets of synthetic gel powder it packaged for inclusion in Hasbro's "Wonder World Aquarium" toy, as well as additional powder that Cloud had blended, but not yet packaged. Cloud asks this court to award damages in the sum of $634,663.05 plus interest and attorneys' fees. Although the circumstances are sympathetic, the court concludes the law does not support Cloud's claim and enters judgment in favor of Hasbro.

# FINDINGS OF FACT

1.      Hasbro, a Rhode Island corporation with its principal place of business in Pawtucket, Rhode Island, designs and markets toys sold around the world. Hasbro has designed and marketed such well-known toys as Monopoly, Mr. Potato Head, G.I. Joe, Star Wars figures, and, more recently, Pokémon merchandise. From 1995 to 1997, Hasbro marketed and sold the "Wonder World Aquarium," an imitation aquarium containing a transparent gel. (Transcript (hereinafter, "Tr.") 278, 756.) To create the transparent gel, "Wonder World" consumers would mix a packet of powder with distilled water and, using tweezers, would suspend plastic fish or other toy objects in the gel to create the toy aquarium. (Tr. 120, 278-79.) The principal ingredient in the gel powder was a synthetic clay material called Laponite, which was developed and patented during the late 1960s or early 1970s by Laporte, PLC, a British firm. (Tr. 30.) Laponite is produced by Laporte in England and distributed in the United States by Southern Clay Products Company, a Laporte subsidiary.[1]

2.      Cloud, a Delaware corporation with its principal place of business in Des Plaines, Illinois, manufactures high-speed packaging machinery and uses this machinery to package powder substances such as Kool-Aid, Swiss-Miss Cocoa, and Domino Sugar. In 1995, Hasbro engaged Cloud to (1) blend Laponite (which would be supplied to Cloud by Southern Clay) with a preservative called Germal and salt, according to a Hasbro formula, (2) package the mixture, and (3) send the packets to one of three Hasbro affiliates (Sunshine, Early Light, and Kam Hung) in the Far East.

---

[1]      The record does not indicate where Southern Clay's principal place of business is located.

2

(Tr. 1131-32, 1245-46.)

3.    In or around January 1994, Anthony Sawyer and Jeffrey Koury of Southern Clay met with Hasbro's chief chemist, Linny Doane, to demonstrate that Laponite, when mixed with water, could form a clear gel in which items could be suspended. (Tr. 31.) Soon after this meeting, Hasbro personnel informed Southern Clay that it had developed a use for Laponite. (Tr. 32.)

4.    During the early part of 1995, Doane tested Southern Clay's standard Laponite product, Laponite RD, and found its gelling capabilities unacceptable because of "clumping" and unsatisfactory clarity. (Tr. 41.) In response to Doane's criticisms, Southern Clay developed a purer type of Laponite, which it named Laponite HB (the "HB" designating Hasbro). (Tr. 46.)

5.    Also in early 1995, Hasbro engaged Cloud to blend and package the Laponite HB. (Tr. 36.) Cloud had served as a Hasbro vendor on prior occasions, dating back to 1990. (*Id.*) Roger Fontenault of Hasbro's Purchasing Department informed Sawyer that Cloud, as opposed to Hasbro, would purchase the Laponite from Southern Clay. (Tr. 36.) The reason for this arrangement, according to Sawyer, was that Hasbro wished the packager (i.e., Cloud) to be responsible for the inventory. (Tr. 37.)

6.    Maryann Ricci, a 14-year employee of Hasbro, worked in Hasbro's Purchasing Department. (Tr. 919.) Ricci assumed temporary responsibility over the purchasing for the Wonder World project when Richard Dollarhide, who worked in contract packaging for Hasbro, became sick in late 1995 and permanent responsibility in March 1996 when Dollarhide left Hasbro. (Tr. 920.)

7.     Kathy Esposito has worked for Hasbro for more than 13 years.[2] At the time of trial, she was the inventory manager for Hasbro's distribution network. (Tr. 1130.) Prior to her tenure as inventory manager (which began in September 1997), and at all times relevant to this dispute, Kathy worked in Hasbro's Operations Planning Department. There, she was responsible for procuring domestic goods for Hasbro's offshore vendors, such as those in the Far East. (Tr. 1130-31.) This task involved taking "releases" (to be described in more detail below) from Hasbro's planners, determining what materials needed to be procured, placing purchase orders, and arranging for shipment of necessary materials to the respective offshore vendor. (Tr. 1131.) Kathy left the Operations Planning Department in September 1997 for reasons unrelated to the Wonder World project. (Tr. 1233.)

8.     On June 23, 1995, representatives of Southern Clay met with Hasbro personnel, including Doane; Norbert Morin, Hasbro's Director of Purchasing; Richard Dollarhide and Maryann Ricci of Hasbro's Purchasing Department; and Kathy Esposito of Hasbro's Operations Planning Department. (Tr. 45; Plaintiff's Exhibit (hereinafter, "PX") 11.) No one from Cloud attended this meeting (Tr. 46, 297), at which the parties negotiated the price Southern Clay would charge for Laponite HB ($8000 per metric ton) and the volume of Laponite HB to be ordered for purposes of the "Wonder World" project. Given the significant volume of Laponite HB that Hasbro expected to order, Southern Clay agreed to sell Laponite HB exclusively for Hasbro projects for up to three years; Southern Clay and Hasbro did not, however, sign an exclusivity agreement

---

[2]     The court, throughout the remainder of this opinion, will refer to Ms. Esposito as "Kathy," to avoid confusion with William Esposito, Hasbro's Vice President of Purchasing.

until January 2, 1996.[3]  (PX38; Tr. 80.)

9.     Jeff Graham joined Cloud in 1990 and became a salesman/account manager in 1992. (Tr. 1395.) Graham is the account manager for Cloud's projects with Hasbro, including the Wonder World project, and has managed various other Hasbro projects for Cloud, including Baby Alive doll food and Baby Sip-n-Slurp Orange Drink. (Tr. 1395-96.)

10.     On July 10, 1995, Hasbro sent purchase orders to Cloud for 141,750 small packets and 141,750 large packets of Laponite HB. (PX15, 16.) Cloud responded by returning written order acknowledgments that same day. (*Id.*) The acknowledgments noted that a Hasbro representative would be present for blending and for the initial start-up of the packaging process. (*Id.*) The first production of packets took place at Cloud during the week of August 14, 1995. (PX20; Tr. 303.) Doane, Hasbro's chemist and the Hasbro representative referred to in Cloud's order acknowledgment, met with Jeff Graham and Mike Aykroid of Cloud that Monday, August 14, to review specifications for mixing the powder for the packets. (PX20; Tr. 304-05.) Then, in order to determine the amount of Laponite HB that would be necessary for this run, Doane multiplied the number of desired packets by the number of grams each package would contain. (Tr. 306; PX12.) Following the initial production run, Southern Clay began shipping Laponite HB to Cloud. (Cloud's Findings, ¶ 18.)

11.     On or around August 22, 1995, Sawyer learned that Hasbro needed 10

---

[3]     It appears that Southern Clay was the party pushing for this exclusive arrangement, and that Sawyer, at some point prior to the signing of the exclusivity agreement, warned Dollarhide that if Hasbro did not sign the agreement, Southern Clay would raise its prices for the Laponite HB. (Tr. 78.)

metric tons of Laponite HB as soon as possible. (PX21.) At some point prior to August 22, Sawyer had received a purchase order of Laponite HB from Graham of Cloud for only 8 metric tons, however; Sawyer brought this discrepancy to Dollarhide's attention in a fax dated September 1, 1995. (Tr. 58; PX23.) A letter from Sawyer to Ricci on September 29, 1995 notes that Cloud placed an order for an additional two tons of Laponite HB, although it is not clear on what date Cloud placed the order. (PX24.)

12.    After the pilot run, the practice among Hasbro, Cloud, and Southern Clay was as follows: Hasbro would issue purchase orders to Cloud for a specific number of small or large packets, rather than for a specific quantity of Laponite HB. (Hasbro's Findings, Section II ¶ 9.) According to Graham, it was Cloud's custom with respect to Hasbro projects to base its production of goods on Hasbro's signed, written purchase orders. (Tr. 1415-16.) Graham would receive Hasbro's purchase orders, prepare an internal purchase requisition, and pass this requisition along to James Zigmund, Cloud's purchasing agent. (Tr. 1431-32.) Zigmund would determine the quantity of Laponite HB necessary to fill Hasbro's orders and then issue a Cloud purchase order to Southern Clay. (Tr. 629, 1365-66, 1432-33.) Thus, after the pilot run, it was Cloud personnel rather than anyone at Hasbro who calculated the amount of Laponite HB required for a specific Hasbro purchase order.

13.    Despite the fact that Cloud personnel determined the amount of Laponite required, Southern Clay always sought Linny Doane's approval of a sample of the shipment before shipping a supply of Laponite HB to Cloud. (Tr. 317, 338.) If Doane

approved the sample, he would so inform Cloud in a letter.[4] Doane nevertheless insisted at trial that these approval letters did not constitute instructions that Cloud should blend or package the full shipment of Laponite HB that Cloud was to receive from Southern Clay. Instead, Doane explained, the approval letters merely provided instruction as to the formula for mixing the Laponite HB, if such mixing were necessary. (Tr. 317-20, 365, 439; PX43.) The text of these approval letters is consistent with Doane's characterization of the letters in that the *primary* purpose of the letters is to communicate the formula for Cloud to use in preparing the Laponite HB mixture: "[t]he formula for the . . . Laponite HB you have just received is as follows;" "[t]he formula for the late September shipment from Southern Clay is as follows;" "[t]he formula for your next run . . . is as follows . . . ." (PX122, 140, 145, 167.) On the other hand, there is no support for Doane's implicit suggestion that mixing was not always necessary.

14.    On October 23, 1995, Hasbro sent a letter to all of its vendors, including Cloud, asking that they "review the attached Terms and Conditions, sign one copy and return it [to Hasbro]." (DX10; PX25.) The letter explained that Hasbro would no longer be requiring that its vendors return a signed copy of each purchase order:

> Hasbro is embarking on an ambitious program to remove as much unnecessary paperwork as possible. One area in which we feel that this task can be accomplished is in the area of purchase orders. In the past we sent two copies to your attention and requested that you return one copy to us, formally known as the acknowledgment. The other was the original which you kept.
> To avoid this in the future we are asking that you review the

---

[4]    Doane sent such "approval letters" to Mike Aykroid of Cloud on August 6, 1996 (Tr. 371, 1081; PX122), October 1, 1996 (PX140), November 13, 1996 (PX145), December 18, 1996 (Tr. 392), and January 6, 1997. (Tr. 381; PX167.)

attached Terms and Conditions, sign one copy and return it to my attention. Please retain one copy for your records. You will now receive one copy of the purchase order and that is your file copy. You will no longer be required to mail back an acknowledgment copy. You must return this form to us no later than November 23, 1995.

One of the Terms and Conditions was: "If notification is not given within 8 days upon receipt of this order, it is understood that all the terms and conditions herein are considered satisfactory." (DX10; Tr. 708.) The October 23 letter instructed the vendors to "return this form to us no later than November 23rd, 1995." (DX10.)

15.    On November 17, 1995, James Keane, Cloud's Vice President and CFO, signed a copy of the Terms and Conditions. (DX10.) That same day, Graham, Cloud's account manager in charge of the Wonder World project, also read Hasbro's Terms and Conditions. (Tr. 1396-99.)

16.    On December 1, 1995, Dollarhide sent Cloud three purchase orders for a total of 528,000 small packets and 900,000 large packets, with a "ship to arrive" date of January 25, 1996. (PX34, 227.) Under the heading "DESCRIPTION," the December purchase orders referred to "REV LAPONITE POLYBAGGED" or "REV C LAPONITE POLYBAGGED." (PX34, 227.) "REV C" designated the revised formula and specifications for the packets (i.e., the amount of Laponite HB per packet relative to Germal and salt). This formula changed from time to time throughout the Wonder World project (e.g., "REV E," "REV G," "REV H"). (Tr. 1507.) Before it would implement a change in the formula, Cloud required only a written request for such change from Hasbro; Graham testified that if any changes to the formula had made a major impact on Cloud, he would have notified Hasbro in writing. (Tr. 1507, 1516-17.)

17.    Together with the three purchase orders Dollarhide sent to Cloud on

December 1, 1995 were three acknowledgment forms. These order acknowledgment forms, which were essentially carbon copies of the purchase orders but were labeled "ACKNOWLEDGMENT COPY ," stated: "Please sign and return this copy with all blanks filled in. The terms and conditions on the back hereof are a part of this offer to purchase."[5] (PX229.) The court notes that this request that Cloud sign and return order acknowledgment forms to Hasbro was inconsistent with the practice Hasbro claims to have instituted with the October 23, 1995 letter it sent to all of its vendors, including Cloud. In any event, Cloud did not execute these order acknowledgments and never returned them; instead, on December 18, 1995, Cloud faxed and mailed to Dollarhide's attention its own form, acknowledging the order for the 528,000 small packets and 900,000 large packets. (PX35, 36, 235.) Cloud's order acknowledgments reflected the quantities ordered by Hasbro on December 1. (*Id.*) Moreover, they stated: "Thank you for your order! We acknowledge receipt of your purchase order, which is accepted subject to the conditions below and the standard contract provisions on the reverse side hereof. If any of the information below is incorrect or incomplete, please notify your Cloud representative within 48 hours." The reverse side included a space for a Hasbro representative's signature. There is no evidence that any Hasbro representative signed or returned Cloud's order acknowledgments.[6]

18. A fax dated December 20, 1995 from Sawyer of Southern Clay to

---

[5] The terms and conditions on the back of these order acknowledgments are identical to those Hasbro sent to Cloud on October 23, 1995.

[6] Although the parties make much of the differences between the terms and conditions on their respective forms, the court concludes, for reasons set forth below, that the differences are not material to the outcome of this dispute.

Dollarhide of Hasbro mentions that Cloud ordered 29 metric tons of Laponite HB from Southern Clay. (PX37.) Cloud then produced the packets ordered by Hasbro, 528,000 small and 900,000 large, and shipped them, as directed, to Hasbro's Far East affiliates in February of 1996.

19.     In January of 1996, Hasbro consolidated the functions previously performed by the planner in the Operations Planning Department and the buyer in the Purchasing Department. (Tr. 893.) Kathy Esposito became the planner/buyer in charge of the Wonder World project. (MR1008; KE1236-37.) Thereafter, Maryann Ricci became involved with Wonder World only in situations where schedules on the purchase orders were not being met. (Tr. 1008.) As planner/buyer, Kathy was authorized to order materials only after receiving a "release" from Hasbro senior management. (Tr. 1239.) She had no authority to adjust the quantity of materials she ordered without receiving an amended release. (Tr. 1240.) Once Kathy received a release, she would use a spreadsheet to calculate the quantities of necessary components and place purchase orders with the appropriate vendors. (Tr. 1241.) Kathy received two releases in 1996 – one in February and another in April. (Tr. 1241.)

20.     On February 20, 1996, Keane, Cloud's CFO, sent a memorandum to Graham, asking whether Cloud had "firm commitments" from Hasbro to "promptly purchase any unused materials." (DX17; PX44; Tr. 1410.) In that same memorandum, Keane specifically asked Graham whether Hasbro would "agree that we can run 100 percent of the powder we order even if we go over the amount of packages that they order?" (*Id.*) On March 13, 1996, Graham sent Dollarhide of Hasbro a proposed

written agreement that would have required Hasbro to purchase any of Cloud's unused Laponite HB. (DX24; Tr. 1413). Neither Dollarhide nor anyone else at Hasbro signed the agreement. (Tr. 1414.) There is no evidence that Graham, Keane, or anyone else at Cloud followed up with Dollarhide, or anyone else at Hasbro, to pursue this proposed agreement.

21.     On February 22, 1996, Doane, Hasbro's chemist, wrote Jeffrey Koury of Southern Clay, with copies to Graham of Cloud, Kathy of Hasbro, and Sawyer of Southern Clay. (PX48.) Doane informed Koury that: "Another order for Laponite HB is on the way. This time it is for 100+ metric tons . . . . Also, you should work out a shipping schedule with your production people, Jeff Graham at Cloud and Kathy Esposito at Hasbro. Here we go!" (*Id.*) Doane testified that he learned of the "100+" figure from Graham in a phone call that he had with Graham shortly before writing the February 22 letter. (Tr. 435.) In that phone call, Graham told Doane that he was ordering 110 tons of Laponite HB from Southern Clay. (*Id.*)

22.     The reference in Doane's letter to the order for 100+ metric tons of Laponite HB that was "on the way" corresponded to the first release that Kathy received in 1996 from Hasbro's senior management. Upon receiving this release, Kathy used a spreadsheet to calculate the number of Laponite packets that she needed to order from Cloud. (PX51; Tr. 1242.) On or around February 26, 1996, Kathy telephoned Graham to place purchase orders. (Tr. 1254-56.) She provided Graham with purchase order numbers and stated the quantities being ordered of each part number, small and large. (Tr. 1254-56, 1263-65, 1438.) Among other things, she and Graham discussed the pricing of the Laponite packets and delivery schedules. (Tr.

1255-56.)

23.     Kathy followed up her conversation with Graham by sending him four separate purchase orders (Numbers: HM33585; HM33587; HM33588; HM33589) for a total of 2,336,000 small packets and 3,217,000 large packets. (PX229.) Cloud received the purchase orders on March 1, 1996, and Graham read them to ensure that the Terms and Conditions matched those signed by Keane in November 1995, which they did. (Tr. 1405.) The February 1996 purchase orders sent by Esposito referred to small packets as parts "46209400 REV E" and to the large packets as parts "46209401 REV E ." (PX229.) "REV E" signified Hasbro's gel powder formula Revision E, which called for the inclusion of 27.8 grams of Laponite HB in every large package and 9.3 grams in every small package. The purchase orders listed a price of 17.4 cents for the small packets and 40.40 cents for the large packets. (*Id.*) The orders set delivery of the packets to Hasbro's Far East affiliates for late May and early June 1996, approximately three to three-and-one-half months after the orders were placed. (*Id.*)

24.     Hasbro sent Cloud acknowledgment forms, like those it had sent with the December 1995 purchase orders, with its February 1996 purchase orders.[7] (PX229.) Again, Cloud did not execute or return these order acknowledgments as directed by Hasbro. (Tr. 506, 577, 900, 1581.) Instead, Cloud responded with its own order acknowledgment forms, but did not send them until April 24, 1996.

25.     Although it is not clear why, Cloud did not immediately order Laponite HB from Southern Clay to fill Hasbro's February 26, 1996 purchase orders.

---

[7]     As noted earlier, the request that Cloud execute and return these forms is inconsistent with the practice Hasbro claims to have instituted in its October 23, 1995 letter to its vendors.

Consequently, on March 5, 1996, Sawyer of Southern Clay wrote to Dollarhide of Hasbro, asking him to intercede with Cloud. (PX52.) In addition to asking Dollarhide for help, Sawyer noted that he understood from previous discussions that Cloud wanted Southern Clay to ship all "100+" tons of Laponite HB at one time in June 1996. Sawyer admitted that, due to physical and financial restraints, Southern Clay would not be able to satisfy such a request. (*Id.*) Instead, Sawyer suggested an alternative plan: Southern Clay would ship the Laponite HB to Cloud in 20 metric ton containers and ask Cloud to order the Laponite HB in 40 metric ton lots so that Southern Clay could satisfy Cloud's requirements in three releases.[8] (*Id.*)

26. As a result of Sawyer's letter, Dollarhide e-mailed others at Hasbro on March 7, 1996, proposing a meeting of representatives from Southern Clay, Cloud and Hasbro to discuss "capacity issues," and specifically explaining that, "[a]t that time we will discuss the new order quantities on the Laponite HB and put in place an acceptable schedule of delivery to Cloud Corporation." (PX53.) Also on March 7, 1996, Southern Clay received three separate orders from Cloud for a total of 110 metric tons of Laponite HB. (PX57.)

27. The meeting that Dollarhide proposed in his March 7, 1996 e-mail took place on March 19, 1996. (PX57.) Sawyer attended and emphasized the production difficulties and delivery limitations associated with Laponite HB. (Tr. 89.) He reminded those present (including Graham and Richard Schweinberg, Cloud's

---

[8] Sawyer's letter mentioned three releases, but it is not clear what size he intended each of the three releases to be. Presumably since Sawyer wanted Cloud to order Laponite HB in 40 metric ton lots, there would be two releases of 40 metric tons each, and one release of 20+ metric tons, equaling the total of 100+ metric tons.

controller; Kathy, Ricci, and Norbert Morin of Hasbro) that Laponite HB was a purer form of Laponite, that it required the use of special machinery, and that it was being exclusively produced for Hasbro on a dedicated production line. (Tr. 89.) Sawyer noted that, due to these difficulties, it would be impossible for Southern Clay to deliver the Laponite HB to Cloud in time for Cloud to mix and package the packets for delivery to Hasbro's Far East affiliates by the late May and early June delivery dates set forth in Hasbro's February 1996 purchase orders. (*Id.*) At best, Sawyer estimated, Southern Clay could deliver the Laponite HB to Cloud in shipments at the end of May, June, and July of 1996. (*Id.*) Sawyer promised to provide Hasbro with an updated estimated delivery schedule as soon as possible. (*Id.*)

28.     After the March 19, 1996 meeting, Hasbro Senior Vice President Brian Prodger, oversaw an investigation to determine the total production time for the Wonder World gel powder packets. (PX69.) According to the results of this investigation, when accounting for shipping and warehousing time, it would normally take a minimum of 16 weeks from the time Cloud placed an order for Laponite HB until Cloud actually packaged the Laponite HB. (*Id.*) Shipping the packets from Cloud to Hasbro's Far East affiliates required an additional four weeks. (*Id.*) Manufacturing and packaging the remaining materials in the Far East for shipment back to the United States required even more time. (*Id.*) Prodger concluded that there was a 26-week lead time from "the minute we ordered the powder to the time we can have product at all." (*Id.*) Because the lead time for Laponite HB was so long, Hasbro began to search for an alternative source of a Laponite-type material. (Tr. 395.)

29.     Sawyer kept his March 19, 1996 promise to update Hasbro on the

schedule for delivery of the 100+ metric tons of Laponite HB. In a letter dated April 1, 1996, Sawyer advised Maryann Ricci of Hasbro (with copies to Linny Doane of Hasbro, Jeff Graham of Cloud, and Jeffrey Koury of Southern Clay) that Southern Clay would deliver 20 metric tons to Cloud on April 26, May 20, June 10, and June 30, 1996, and 30 metric tons on July 31, 1996. (PX72; DX13; Tr. 92, 961-62.) On April 18, 1996, Graham wrote Kathy, informing her that Cloud was "getting ready to start producing the pouches [pursuant to the February orders] for the Wonder World toy." He specified that the first run would start on May 6, 1996 and the second run would start on June 3, 1996. (PX76.)

30. Later in April, Kathy received the second and final release from senior management for 1996. After receiving this release, Kathy again created a spreadsheet to determine how many small and large packets she needed to order from Cloud. (DX40; Tr. 1257.) On April 22, 1996, Kathy called Graham to place an order for 1.5 million small packets and 1.4 million large packets.[9] (Tr. 1263, 1436, 1438.) Graham

---

[9] The court notes that Graham testified at trial that, in their April 22, 1996 conversation, Kathy Esposito placed an order for 4.5 million small packages and 5 million large packages. (Tr. 1455.) Graham acknowledged that he did not recall having prepared any notes or any writing to document the number of packages he claims she ordered, and no such evidence was ever produced. (Tr. 1456.) Graham admitted that there was doubt in his mind as to whether Kathy had really ordered more than nine million packages. (Tr. 1457.) Graham further admitted that the purchase requisitions he prepared shortly after his telephone call with Kathy reflected numbers consistent with Kathy's testimony about the April orders, specifically, 1.5 million small and 1.4 million large packages. (Tr. 1461.) Schweinberg testified that after Kathy Esposito's deposition and after Cloud's interrogatories to Hasbro were answered, Cloud decided it would not dispute the number of packets ordered during this conversation, and would not rest its case on the assertion that Kathy had ordered more than nine million packets during the April conversation. (Tr.731.) Instead, Schweinberg testified, Cloud chose to center its case on the documentary evidence, rather than on the substance of a contested conversation. (*Id.*)

testified that he understood that this Hasbro order would satisfy Hasbro's requirements for the remainder of 1996. (*Id.*) While the quantity of packets was set, price and the delivery date were left "up in the air." (Tr. 1445.) Graham testified that he was still working on pricing issues because (1) he did not yet know the price that Southern Clay would charge for the Laponite HB (Southern Clay was expected to raise the price for Laponite around July 1, 1996[10] (Tr. 1581)); and (2) he already had information from Doane of Hasbro that, in anticipation of the production run upcoming in May 1996, Hasbro was "planning to make changes to the blend, changes to the pouch size, and that would in turn have affected the price." (Tr. 1446-48.)

31.    As for the delivery date, Kathy told Graham that Hasbro hoped all of the Laponite from this April order would be delivered by Southern Clay to Cloud in August of 1996 and the packets delivered to Hasbro's affiliates in the Far East by October 31, 1996. (Tr. 1264, 1441-45.) Because both Kathy and Graham knew that it would be difficult, if not impossible, to meet these goals, they left these dates as mere targets. (Tr. 1264.) Graham testified that, despite the price and delivery date being "up in the air" (Tr. 1445), Kathy placed the order and he accepted it. (Tr. 1445, 1452, 1456-57; DX2, Int. No. 8 ("It was clearly understood that Ms. Esposito was placing a firm order with Mr. Graham and that Mr. Graham was accepting it as a firm order because this enabled–and made it necessary for–Cloud to place an order with Southern Clay Products, Inc. for the purchase of the Laponite that was to be used in the powdered gel that was to be packaged in the laminated pouches.").)

---

[10]    It is unclear from the record how Graham knew that Southern Clay planned to raise its prices.

32.     After this April 22, 1996 telephone conversation, following his normal procedure, Graham prepared a purchase requisition so that Cloud could order the amount of Laponite HB that it needed from Southern Clay to fill Hasbro's April order. (Tr. 1458; DX42.)  He passed the requisition along to Zigmund, Cloud's purchasing agent, and advised Zigmund that he wanted the delivery date to be August 31, 1996. (Tr. 1370, 1458-59, 1461.)  The April 22, 1996 purchase requisition form reflects that Graham asked Zigmund to order enough material to produce 1.5 million small packets at 9.3 grams and 1.4 million large packets at 27.8 grams. (Tr. 1369, 1460-61; DX 42.)[11]

33.     Using Hasbro's Revision E formula, Zigmund calculated that Hasbro's April purchase orders would require an additional 54 metric tons of Laponite HB.  (Tr. 634, 1371-73; DXS 42, 43.)  Accordingly, on April 23, 1996, Cloud ordered 54 metric tons of Laponite HB from Southern Clay (Tr. 635, 1386; PX79; DX44); Richard Schweinberg, Cloud's controller, authorized the purchase. (Tr. 1384.)  At the time Cloud placed this order, it had not yet received from Southern Clay any of the 100+ metric tons of Laponite HB it had ordered pursuant to Hasbro's February 1996 purchase orders.

34.     On April 25, 1996, Kathy confirmed her telephone call to Graham by sending him four purchase orders (Numbers: HM35010; HM35011; HM35013; and HM35016). (PX227.)  While Graham testified that he never personally received these

---

[11]     It is worth noting that Graham prepared this requisition form on the same day that he received the telephone order for packets from Kathy, and that in the form, Graham requested that Zigmund order enough materials to prepare 1.5 million small and 1.4 million large packets.  This substantially undermines Graham's assertion that Kathy actually ordered more than nine million packets, an assertion Graham himself admitted he was not sure about, and Cloud has now withdrawn.

purchase orders (Tr. 1475), the purchase orders were in fact found in the files of Patricia Skic, then employed as a sales secretary for Cloud, marked with a "Received" stamp indicating April 29, 1996 as the date of receipt. (PX227; Tr. 610-11, 1472.) These April purchase orders: (a) called for an additional 1.5 million small packets and 1.4 million large packets; (b) instructed Cloud to mix the gel powder packets pursuant to formula Revision E; (c) set a price of 17.4 cents per small package; (d) set a lower price of 12.64 cents for each large package (a price characterized by William Esposito of Hasbro as an "absurd" error) (Tr. 829); and (e) called for the delivery of the Laponite HB packets to Hasbro's Far East affiliates on July 25, July 31, and August 2, 1996.[12] (PX227.)

35.     Along with these April 25, 1996 purchase orders, Hasbro sent its standard order acknowledgment forms requesting that Cloud sign and return them. Again, Cloud did not execute or return the order acknowledgments. (Tr. 900.)

36.     On April 24, 1996, the day before Kathy sent Cloud the April purchase orders, Cloud sent Hasbro order acknowledgments *for the February purchase orders.* (PX81-84; Tr. 927.) These acknowledgments were on Cloud's own forms and contained the same language as those Cloud sent to Hasbro in December 1996. (PX81-84.) Skic testified that she personally faxed and mailed these order acknowledgments to Ricci's attention at Hasbro. (Tr. 497.) Contrary to normal practice at Cloud, the order acknowledgments did not contain a handwritten notation "faxed" or "mailed" at the bottom. Nevertheless, the acknowledgments appeared in Ricci's file and she

---

[12]     It is unclear why the delivery dates set forth on the purchase orders are so much earlier than the October 1996 dates discussed in the April 22 conversation between Kathy Esposito and Graham.

acknowledges that she must have received them. (Tr. 928-29.)

37.    The order acknowledgments Cloud sent Hasbro on April 24 referred specifically to Hasbro's *February 1996* purchase orders by purchase order number *and reflected the same quantities of small and large packets as those orders.*  The acknowledgments set forth Cloud's intentions to (a) begin packaging large packets on May 6, 1996, and small packets on June 3, 1996, with the entire order to be completed by August 16, 1996; and (b) charge 38.31 cents per large package and 14.387 cents per small package, as opposed to the 40.40 cents per large package and 17.4 cents per small package set forth in Hasbro's purchase orders.  (PX81.)  The April 24 order acknowledgments also expressly permitted a variance of the specified quantity of as much as five percent.  (*Id.*)

38.    From April 1996 to July 1996, Kathy and Graham had four or five conversations regarding the delivery schedules for Hasbro's February and April purchase orders.  (Tr. 1269-74.)  As previously noted, Southern Clay was slow in its delivery of Laponite HB to Cloud and, consequently, Cloud was not delivering Laponite HB packets to the Far East in a timely fashion.  As early as April 1996, Hasbro learned that its Far East affiliates were at risk of halting production because they were short on packets.  (Tr. 1271-72.)

39.    In May 1996, Cloud received from Southern Clay a 20-metric-ton shipment of Laponite HB, the first shipment pursuant to Hasbro's February purchase orders.  (Cloud's Findings, ¶ 37.)  Cloud used this material to package and deliver large gel powder packets to Hasbro.  (*Id.*)  Cloud sent Hasbro invoices charging the prices set forth in Cloud's April order acknowledgments, rather than the higher prices set in

Hasbro's February purchase orders. (PX240.) Hasbro accepted delivery and paid the prices as charged by Cloud. (Cloud's Findings, ¶ 37.) According to Ricci, Kathy had told her that the price on the invoices from Cloud might be lower than the purchase order price. (Tr. 1016-17.) Ricci testified that when a Cloud invoice set forth a different price than that on a Hasbro purchase order, someone from Hasbro's accounts payable department would bring the discrepancy to her attention. (*Id.*) She would then cause the system to be adjusted to accept the price on Cloud's invoice. (*Id.*)

40.    On June 3, 1996, Doane, Hasbro's chemist, wrote to Mike Aykroid of Cloud, with copies to Ken Turner,[13] Hasbro's "team leader" for the Wonder World project; Kathy and Ricci of Hasbro; and Graham of Cloud, instructing Cloud to stop using the Revision E formula when mixing and preparing the gel powder packets. (DX51; PX91; Tr. 351, 1504; Cloud's Findings, ¶ 41.) The new formula to be used, called Revision G, reduced the amount of fill in the packets: for large packets, it was reduced from 27.8 grams to 21.4 grams, and for small packets, from 9.3 grams to 7.15 grams. (PX91.) This change in formula, which Graham had anticipated in his April 22, 1996 conversation with Kathy Esposito (Tr. 1506), meant that a given amount of Laponite HB could now produce approximately one third more packets.[14]

---

[13]    On June 6, 1996, Turner wrote six other Hasbro employees (but not Doane) complaining about Doane's unilateral assumption of authority in directing Cloud to implement a change to the Wonder World gel powder package formula. (PX96.)

[14]    In a June 11, 1996 memorandum to Turner and other Hasbro employees, Doane explicitly recognized that the formula change would lead to the production of more gel powder packets. (PX95.) Doane wrote, "The two differences you should notice about the new Magic Gel packets are that they cost less and that there are more of them. Mixing, gel time, and gel function are the same or slightly improved." (*Id.*)

41.     Graham testified that when he received the June 3, 1996 formula change, he implemented it "just like he had implemented other changes to the specifications and formulas in the past." (Tr. 1514-15.)

42.     On or around June 10, 1996, Schweinberg, Cloud's controller, calculated the approximate number of small and large packets that could be produced, pursuant to Revision G, from the 144 metric tons of Laponite HB remaining on order with Southern Clay (the 110 tons ordered in February plus the additional 54 tons from April, minus the 20 tons delivered to Cloud in May). (PX92; Tr. 561-62.) Schweinberg determined that the 144 metric tons would produce 4.5 million small packets and 5 million large packets. (Tr. 561-64, 573, 649.) Using a Cloud computer program, Schweinberg then calculated a price of 13.051 cents for the small packets and 33.913 cents for the large packets. (Tr. 574.) Schweinberg testified, and the computer print-outs show, that after these prices were generated, they were reviewed and approved by Cloud's Pricing Committee, which consists of senior Cloud employees. (Tr. 572.)

43.     Graham then prepared order acknowledgments based on the prices approved by the Pricing Committee. (Tr. 1610.) On June 25, 1996, Pat Skic, Cloud's sales clerk, faxed and mailed these Cloud order acknowledgments to Maryann Ricci's attention at Hasbro.[15] (PX104, 106; Tr. 501.) Ricci testified that she never received these acknowledgments, but Cloud's fax transmission records and telephone

---

[15]     At trial, Skic identified logs of handwritten entries she ordinarily prepared each time she typed an order acknowledgment. These logs were produced, Skic identified them, and they appeared to be unaltered. Entries on June 25, 1996 indicate that Skic prepared order acknowledgments 5433 and 5434 for Hasbro. Skic testified that she prepared the June 25, 1996 order acknowledgments based on information she received from Graham. (Tr. 507.)

transmission records support the contention that these acknowledgments were sent to Hasbro at a fax number utilized by Ricci. (PX244; Tr. 934-35.)

44.     The substance of Cloud's June 25, 1996 order acknowledgments differed substantially from Hasbro's February and April purchase orders. (PX104, 106.) First, these June order acknowledgments referred to the order being accepted as 4,500,000 small packets and 5,000,000 large packets instead of 1.5 million small packets and 1.4 million large packets. (*Id.*) Second, the order acknowledgments set forth the new prices, as developed by Schweinberg and approved by Cloud's Pricing Committee, of 13.051 cents per small packet and 33.913 cents per large packet, instead of 17.4 cents per small packet and 12.64 cents per large packet. (*Id.*) Third, in accordance with Doane's instruction that Cloud use the Revision G formula specifications when mixing packets, the order acknowledgments stated the amount of gel powder in each package to be 7.2 grams in small packets and 21.4 grams in large packets. (*Id.*) Fourth, Cloud's June order acknowledgments contained a revised completion date of December 1996.[16] (*Id.*)

45.     At some point in mid-July, in one of their discussions relating to delivery schedules, Kathy Esposito asked Graham for a revised schedule for the delivery of packets to the Far East. (Tr. 1274, 1482-83.) Graham responded in a letter dated July 30, 1996, which did not mention the December 1996 completion date set forth in Cloud's June order acknowledgments, nor any other potential completion date. (Tr. 1277; PX119.) From Graham's letter, Kathy concluded that Southern Clay had fallen

---

[16]     Cloud's order acknowledgments set December 1996 as the completion date for production of the packets, but do not set forth any intervening delivery dates.

behind in delivery of Laponite HB to Cloud. (Tr. 1278.) Instead of delivering the Laponite to Cloud on April 26, May 20, June 10, June 30, and July 31, 1996, Graham's letter explained that Southern Clay would only be able to ship to Cloud 18 metric tons per month from August 1996 through January 1997. (PX118, 119.) Kathy contacted Graham upon receiving his July 30 letter, and told him that she found such a delivery schedule to be "totally unacceptable." (Tr. 1278.)

46.     Graham testified that, during that same mid-July phone call, either he or Kathy suggested that Cloud take each 18-metric-ton shipment from Southern Clay and produce approximately 600,000 small packets and 600,000 large packets to ship to Hasbro's Far East affiliates. (Tr. 1484.) Kathy steadfastly denies specifying a number; she claims that she merely told Graham to "split the production so that [she] would have about the same number of packets each month for each toy." (Tr. 1279-80, 1486-87.) Graham admitted that Kathy's recollection of the conversation may be correct. (Tr. 1487.) He acknowledged, further, that he did not have a conversation with Kathy or anyone else about producing packages in excess of the February and April 1996 purchase orders. (Tr. 1490.)

47.     Kathy admittedly did not check the numbers that arose during the conversation against Hasbro's purchase orders because she relied on Graham to comply with Hasbro's February and April 1996 purchase orders. (Tr. 1285, 1290-91.) Kathy did, however, use the "600/600" figures in a subsequent e-mail to Hasbro's Far East office on August 7, 1996.[17] (PX125; Tr. 1151.) She wrote:

---

[17]     At the commencement of the trial, Cloud asked this court to draw an adverse inference based on Kathy's alleged destruction of evidence. The basis for this
(continued...)

I have been working with our vendor [Cloud] and have a revised schedule.

600,000 small and 600,000 large. Pls [sic] confirm what vendors [in the Far East] to ship to keep production flowing. Based on information from the vendor, the balance of the schedule will be 600,000 each of small and large monthly 9/15, 10/15, 11/15, 12/15, 1/15/96.

. . .

Can you update your spreadsheet that shows each item and each vendors [sic] commitment so we can review the full impact of this with the team[?] I have concerns based on these latest delays and need to understand how much we will now have in excess based on having a balance to ship to you of 3.6 million large and 3.6 million small packets.

Kathy testified that, although she set forth Cloud's numbers in this e-mail, she was unaware that Cloud expected to produce more packets than specified in Hasbro's purchase orders. (Tr. 1166-68.) She explained that she did not check these figures against Hasbro's purchase orders because she took Graham's schedules "at face value." (Tr. 1281-85, 1293.)

48.     After sending the e-mail on August 7, 1996 and expressing concern over

_____

[17](...continued)
request is as follows: Beginning in 1995, Kathy Esposito created a file called "Laponite" on Hasbro's e-mail system. (Tr. 1185; PX246.) In discovery, Hasbro produced what it purported to be this file. (Tr. 1186.) Kathy testified that she simply printed out the entire file as requested by Hasbro's counsel. (Tr. 1186.) However, the file she produced contained no e-mail messages from May 15, 1996 through September 10, 1996. (Tr. 1197.) On the other hand, a large number of messages relating to Cloud and Laponite HB were saved from the period prior to May 15, 1996 as well as the Spring of 1997. (Tr. 1197-98.) Among the messages not included in the production was Kathy's August 7, 1996 e-mail to Hasbro's Far East office in which she stated that she had "worked out" a schedule with Cloud. This and several other revealing e-mail messages were produced at a later date with material from the Far East office.

Kathy testified that she did not make it a practice to save e-mail she sent to other people. Moreover, she exercised her own judgment in deciding which messages to save. Despite the potential importance of these missing messages to this litigation, the court found Ms. Esposito's testimony credible and concludes that she exercised her judgment in good faith, and made no intentional effort to subvert Cloud's discovery.

potential delivery delays, Kathy called Ricci and told her "the [proposed delivery] schedule was outrageous and it stunk and please get involved and do what you can to improve it." (Tr. 1283.) Kathy did not mention to Ricci that the number of packets scheduled to be produced would exceed Hasbro's February and April purchase orders.

49.   On August 7, 1996, Ricci contacted Sawyer to ask him to accelerate Southern Clay's delivery of the last 54 metric tons of Laponite HB. Ricci requested that the full delivery be made by September 30, 1996, as opposed to delivery in 18-metric-ton installments at the end of October, November, and December 1996. (Tr. 98.) No one from Cloud participated in this August 7, 1996 telephone call. (Tr. 101.)

50.   On August 12, 1996, less than a week after their conversation, Sawyer wrote to Ricci, offering to accelerate the shipments if Hasbro would agree to pay one-half of the extra manufacturing costs Southern Clay would incur due to such acceleration (equal to $37,500). (PX132; Tr. 100-01, 944.) Again, Cloud personnel were not aware of this negotiation and did not receive a copy of this letter. (Tr. 101.) In a September 6, 1996 telephone conversation, Ricci informed Sawyer that Hasbro would not accept Southern Clay's proposal. (Tr. 104.) In a September 25, 1996 letter, Ricci told Sawyer that Hasbro would accept the previously arranged schedule, pursuant to which Southern Clay would ship 18 metric tons per month from August 1996 until January 1997. (Tr. 108, 262.) Sawyer testified that Ricci also told him of Hasbro's expectation that requirements for Laponite HB would increase by 50% in 1997. (Tr. 109.)

51.   On a copy of Sawyer's August 12 letter, Ricci wrote "Cloud O/S; 4,000,000 sm; 3.5 million lg." (Tr. 1109; PX132.) Cloud contends, and Hasbro does not challenge,

that the logical interpretation of this notation is that "Cloud O/S" refers to "Cloud outstanding orders" and that the notations thus reflect the number of gel powder packets Ricci believed to be outstanding and undelivered by Cloud. The only possible basis suggested in the record for Ricci's figures were Cloud's June 25 order acknowledgments, adjusted downward to account for Cloud's deliveries of Revision G packets prior to August 1996.[18]

52.     For several months, Southern Clay's production and delivery of the Laponite HB packets proceeded without incident. Cloud blended and packaged the gel powder pursuant to Hasbro's Revision G formula and then contacted Hasbro to determine the appropriate shipping destination in the Far East. After shipping the packets to the Far East, Cloud sent invoices to Hasbro (PX240), charging the prices per package set forth in its June 25 order acknowledgments. Hasbro paid Cloud through December 1996 for these shipments.

53.     On December 6, 1996, Kathy sent an e-mail to Hasbro's Far East offices, inquiring where to send two separate shipments, one in December for 600,000 small and 600,000 large packets, and one shipment to come in January of 650,000 small and 600,000 large packets. (PX156; Tr. 790, 1159.) She asked the Far East offices to update their schedule with this information so she could "plan when [she] next

_____

[18]     Cloud's June 25 order acknowledgments called for 4.5 million small and 5 million large packets. Subtracting the 1,461,250 large Revision G packets delivered in June and July of 1996 and the 500,000 small Revision G packets delivered in June of 1996 from Cloud's June 25 order acknowledgment numbers would yield 4 million small packets and 3.5 million large packets outstanding, the same numbers written by Ricci. Conversely, had Ricci based her calculations on quantities set forth in Hasbro's February and April purchase orders, she would have determined that only 3.34 million small and 2.35 million large packets remained unshipped as of August 12, 1996.

need[ed] to place an order with [her] vendor." (PX156.) Four days later, Shadow Ho, an employee in Hasbro's Hong Kong office, responded to Kathy, expressing for the first time that Hasbro's supply of Laponite packages was greater than necessary. Specifically, Ho asked Kathy to "please advise how long you can hold off on these laponite." (PX151; Tr. 1162.) Ho repeated her concerns to Kathy on December 12, when she wrote, "we would like to hold off the laponite until we receive new orders . . . ." (PX157.) As of December 12, 1996, Cloud had not blended and packaged the December shipment of Laponite HB it had received from Southern Clay; yet no one from Hasbro contacted or advised Cloud to suspend the packaging of this Laponite HB or to stop the upcoming January production run.

54. On December 18, 1996, Doane sent to Cloud an "approval letter" for Southern Clay's December shipment of Laponite HB. (PX159; Tr. 793.) On January 6, 1997, Doane sent another "approval letter," this one for Southern Clay's January 1997 shipment. (PX167.) The January letter was sent to Cloud almost one full month after Kathy was asked by Hasbro's Far East office to "hold off" on the Laponite HB packets. (Tr. 167; Tr. 793.)

55. Kathy told Ricci in December 1996 that the forecast demand for Laponite HB packets for the first quarter of 1997 was two million small and two million large packets. (Tr. 979-82, 1013, 1084-85.) Ricci conveyed this information to Cloud and asked Cloud to provide a pricing quote for the forecasted amounts. (Tr. 979-82, 1084-85.)

56. In late December 1996, Schweinberg, Cloud's controller, called Barbara Ghigliotty of Hasbro's Accounts Payable Department to inquire about Cloud invoices

that were not yet paid. (Tr. 579-80.) According to Schweinberg, Ghigliotty instructed him to use purchase order number HM31596, a number that corresponded with an Hasbro purchase order from December 1995. (Tr. 581.) Because the quantities produced by Cloud were in excess of the December 1995 order, Ghigliotty told Schweinberg that Hasbro's Purchasing Department would amend the purchase order to reflect the extra quantities. (*Id.*) On January 3, 1997, Schweinberg sent the invoices to Ghigliotty's attention; these were invoices for the small and large packets produced by Cloud during December 1996. (Tr. 582.) One invoice was for $90,182.41 (PX165) and the other for $203,444.09 (PX166). Schweinberg marked the invoices with the notation "HOLDING AT CLOUD." (Tr. 582; PX165, 166.) No one at Hasbro paid these invoices, nor did Hasbro instruct Cloud to stop mixing. (Tr. 1076.) On February 3, 1997, Schweinberg sent similar invoices to Ghigliotty, again using the HM31596 purchase order number, for the small and large packets produced as part of the January 1997 run. (PX183, 184.) One was for $178,015.64 (PX183) and the other was for $388,846.47 (PX184). No one at Hasbro paid these invoices either.[19] (Tr. 591, 1076.)

57.    In or around December 1996, still concerned about the long lead time for Laponite HB and concluding its search, begun months earlier, for an alternative source of Laponite-type material, Hasbro negotiated an arrangement with a German company, Sud Chemie, which would both produce and package such a material

---

[19]    At her deposition, Ghigliotty did not recall having these conversations with Schweinberg or receiving the January or February Cloud invoices. (Cloud's Findings, ¶ 87.) Ricci testified, however, that Ghigliotty did bring the invoices to her. (Tr. 989.)

(Optigel). (Tr. 397.) Doane tested and approved Optigel. (Tr. 398.)

58.　On or about January 15, 1997, William Esposito, Hasbro's Vice President of Purchasing and the individual responsible for overall supervision of Hasbro's purchasing operations in connection with the Wonder World project, learned that there was there was enough material in inventory in the Far East to last through 1997 and into 1998. (Tr. 873.) He ordered Hasbro to cancel orders for additional packets with Sud Chemie because of this surplus (Tr. 811), but testified that, by this time, it was too late to cancel any of Cloud's production runs. (Tr. 812.)

59.　On January 22, 1997, William Esposito initiated an investigation to determine the reasons for the surplus, speaking to both Ricci and Kathy. (Tr. 815.) He obtained a print-out of Hasbro's computer program that recorded goods received against Hasbro purchase orders (PX173; Tr. 838); the report showed "over-receivings" against more than half of Hasbro's Laponite purchase orders and "under-receivings" on some of the other purchase orders. (Tr. 841-47, 866.) William Esposito instructed Kathy to fix the Cloud purchase orders and to change them to "the proper way it should have been done in the first place." (Tr. 865-66.) After performing this reconciliation, Kathy determined that there were only 910,000 small packets and 428,000 large packets still due to Hasbro from Cloud pursuant to Hasbro's February and April 1996 purchase orders, far fewer than the amount Cloud was prepared to deliver. (Tr. 1297.)

60.　William Esposito also requested the original April 1996 purchase orders that Hasbro sent to Cloud. (Tr. 851.) Three of the four original purchase orders, however, could not be found in Hasbro's files. (Tr. 852.) To remedy this problem,

William Esposito directed that copies of Hasbro's purchase orders be generated from computer files. (Tr. 853.) These copies, produced at trial, were not identical to the original purchase orders and instead reflected adjustments in the parties' dealings over time. (*Id.*) For instance, the reprinted purchase orders contained the same price term as quoted in Cloud's June 25 order acknowledgment, rather than the term originally set out in February or April 1996 by Hasbro. (*Id.*) Also, unlike the original purchase orders that referred to "Revision E," the reprinted purchase orders referred to "Revision H," a designation not explained at trial. (Tr. 860.)

61.     On February 19, 1997, William Esposito wrote a letter to Sawyer of Southern Clay (PX191; Tr. 822, 1307) stating: "For reasons unknown to me, we overordered Laponite packets in 1996 to the point where we are overstocked with enough packets to last us through 1997 and into 1998. This includes inventory of finished goods at Hasbro and inventory of packets in the Far East. Our planning department is busy trying to put together the pieces of the puzzle that caused this terrible mishap." (*Id.*) William Esposito testified that the "terrible mishap" he was referring to was not that Hasbro had agreed to purchase packets over and above the amount ordered in February and April 1996, but that Hasbro's forecast for how much product it would need was significantly off the mark. (Tr. 874, 1308.)

62.     On March 18, 1997, Ricci called Graham and Schweinberg of Cloud; she wanted them to draft a letter explaining how and why Cloud had such an excess of Laponite packages on hand. (Tr. 1524-25.) Graham responded with a letter on March 19, 1997 (Tr. 691, 1073, 1525; DX90; PX202), attached to which was a spreadsheet prepared by Schweinberg and Graham. Doug Robison, Cloud's Chief

Executive Officer, reviewed the letter before it was sent to Ricci. (Tr. 1526.) The letter referred to an order made on "verbal instructions" by Esposito in April for 4.5 small packets and 5 million large packets. (PX202.) Notably, the letter made no mention of Cloud's recalculation of the number of packets that could be produced after Hasbro's June 3, 1996 formula change. (Tr. 695-96, 1531.)

63. On May 1, 1997, Robison sent a letter to William Esposito with copies to Jeff Graham, Jonathan Bunge (Cloud's attorney), and Schweinberg. (Tr. 1112; DX100.) Attached to this letter were a number of Cloud order acknowledgments, including the ones from June 25, 1996. (Tr. 1122.)

64. Cloud filed this lawsuit on May 9, 1997. On November 5, 1998, Cloud filed its First Amended Complaint, consisting of three counts. In Count I, Cloud alleges that the June 3, 1996 letter from Linny Doane of Hasbro to Mike Aykroid of Cloud, setting forth the formula change from Revision E to Revision G, combined with Cloud's June 25, 1996 order acknowledgments, created a contract for the purchase of 4.5 million small packets and 5 million large packets of Laponite HB. Count II alleges that, pursuant to Sections 2-207(3) and 2-208 of the Uniform Commercial Code, the course of dealings between the parties created a contract for the quantity of packets that Cloud produced. In Count III, Cloud alleges that the communications by Linny Doane and Kathy Esposito to Cloud throughout the latter half of 1996 created a contract for the purchase of the packets Cloud produced and for the product blended.

65. Hasbro denies each of these claims. As an affirmative defense, Hasbro asserts that Cloud's claims are barred by Section 2-201(1) of the UCC (the Statute of Frauds). Hasbro also contends that Cloud was not authorized to, nor was it reasonable

for Cloud to, produce packets in excess of Hasbro's signed, written purchase orders, as Cloud's conduct was contrary to the parties' course of dealing.

66.    On December 21, 1998, Cloud and Hasbro entered into a stipulation pursuant to which Cloud shipped Hasbro 910,000 small packets and 428,505 large packets of gel powder and Hasbro paid Cloud $264,098.26, amounts for which Hasbro had issued purchase orders but had previously refused to accept delivery.

67.    Cloud claims that it is still entitled to $634,663.05 plus interest on the unpaid amounts (either at the rate of 18% percent found in the June 25 order acknowledgments or Illinois' statutory rate of 5%) and attorneys' fees. Specifically, Cloud contends that the original contract quantities under the June order acknowledgments were 4,500,000 small packages and 5,000,000 large packages. These order acknowledgments authorized Cloud to ship up to 5% more than the stated quantities. Thus, Cloud contends, the June order acknowledgments demonstrate that Cloud had agreed to ship Hasbro 4,725,000 small packets and 5,250,000 large packets. When the number of packages that Hasbro received and paid for (including those paid for pursuant to the December 21, 1998 stipulation) are subtracted from these quantities, a total of 1,070,000 small packets and 1,350,000 large packets remains. Cloud multiplies these remaining quantities by the price per packet set forth in the June 25 order acknowledgments (13.051 cents per small packet and 33.913 cents per large packet). The total due is $139,645.70 for the small packets and $414,451.64 for the large packets, a sum of $556,097.34. To the sum, Cloud adds $78,200 for the blended, but not yet packaged, Laponite (Cloud sent Hasbro an invoice in this amount on March 25, 1997) (Tr. 592) and $365.71 for the packets actually shipped and received

by Hasbro, but not yet paid for (Invoice #76749).

## CONCLUSIONS OF LAW

1. **Contract Formation**[20]

Each of Cloud's three counts asserts a breach of contract. According to Cloud, the agreement requires Hasbro to purchase some nine million packets of blended Laponite. Hasbro acknowledges there was an agreement between the parties, but disputes the quantity term Cloud claims.

According to § 2-204(1) of the Uniform Commercial Code ("UCC"), "[a] contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract." 810 ILCS 5/2-204(1); *ProCD, Inc. v. Zeidenberg,* 86 F.3d 1447, 1452 (7th Cir. 1996). Hasbro argues that a contract was created during conversations between Kathy Esposito and Jeff Graham in February and April 1996, and the terms and conditions governing the

---

[20]    The court notes, preliminarily, a choice of law issue. In a footnote in its Memorandum of Law in Support of Its Proposed Findings of Fact and Conclusions of Law, Hasbro asserts that, per the terms of its purchase orders, the law of Rhode Island should apply. The court suspects that this, Hasbro's sole mention of Rhode Island law, was intended to underscore its position that the terms and conditions of its purchase orders govern the transaction, rather than to genuinely dispute the application of Illinois law. After mentioning Rhode Island law, Hasbro quickly concedes that the Uniform Commercial Code has been adopted in both Rhode Island and in Illinois, and that decisions of all jurisdictions that have enacted the UCC are "highly persuasive." *Triangle Marketing, Inc. v. Action Indus., Inc.,* 630 F. Supp. 1578, 1579, n. 1 (N.D. Ill. 1986). Furthermore, Hasbro cites numerous Illinois cases in its brief, while citing no Rhode Island decisions. As is common in UCC cases, whether or not Illinois or Rhode Island law applies here is not dispositive. The court finds this situation to be akin to those wherein "neither party raises a conflict of law issue in a diversity case, [and] the federal court simply applies the law of the state in which the federal court sits." *McFarland v. General Am. Life Ins. Co.,* 149 F.3d 583, 586 (7th Cir.1998), *quoting Wood v. Mid-Valley Inc.,* 942 F.2d 425, 426 (7th Cir. 1991). Thus, Illinois law will apply here.

contract were specified in Hasbro's written purchase orders. Indeed, Graham himself testified at trial that in each of these conversations, Esposito placed an order and he accepted those orders. Cloud nevertheless insists that no contract was formed in those conversations. Cloud characterizes the February and April conversations between Graham and Kathy Esposito as "negotiations," and the purchase orders Hasbro sent to Cloud following those conversations as mere offers to purchase. *See* Cloud Corporation's Response to Hasbro's Proposed Findings and Hasbro's Supporting Memorandum at 2, 12. Cloud contends that it did not accept Hasbro's purchase orders because Cloud did not sign and return the acknowledgment copy of each of those purchase orders as directed.[21]

Cloud's insistence that there was no agreement between the parties in early 1996 is curious. Perhaps Cloud believes that the court will be more likely to enforce the terms of Cloud's order acknowledgments if the court concludes that there was no oral agreement between the parties. The evidence, however, is plainly at odds with the notion that the parties reached no agreement in February and April. In addition to the testimony about the substance of the February and April telephone conversations, Cloud's subsequent conduct is entirely consistent with the belief that a contract to produce blended packets of Laponite HB had been formed during each of those conversations. The April telephone order occurred on April 22, 1996. Graham

---

[21]     The court also notes that, although the acknowledgment copy states "PLEASE SIGN AND RETURN THIS COPY WITH ALL BLANKS FILLED IN," it does not identify any consequence of Cloud's failure to do so, and does not state that Hasbro is bound by the purchase order only if Cloud signs and returns the form. As noted earlier, the request set forth in these acknowledgment copies is inconsistent with Hasbro's October 23, 1995 letter to its vendors.

gave Zigmund a purchase requisition for Laponite HB sufficient to fill this April order for 1.5 million small and 1.4 million large packets either on the same day or very shortly thereafter. Zigmund calculated that 54 metric tons of Laponite HB were necessary to fill the order. Zigmund confirmed this calculation with Schweinberg, who authorized Zigmund to prepare a purchase order to Southern Clay for the Laponite HB. Schweinberg reviewed and signed the purchase order, and it was sent to Southern Clay. These actions can only be understood as evidence that Graham had accepted Hasbro's offer to purchase the Wonder World packets.

The circumstances in February were similar, except for a slight delay in Cloud's order for Laponite HB. The February phone order from Hasbro occurred on the 26th, and Southern Clay did not receive purchase orders from Cloud for the Laponite HB to fill the order until March 7, 1996. This delay is inconsequential, in the court's view: Graham testified that he accepted purchase orders made by Kathy Esposito in February and April phone calls, and Cloud proceeded to order mass quantities of the non-fungible Laponite HB needed to fill Hasbro's orders. The court concludes that the parties entered into an oral contract, pursuant to which Cloud would produce 3.8 million small packets (2.3 million pursuant to the February conversation and 1.5 million pursuant to the April conversation) and 4.6 million large packets (3.2 million pursuant to the February conversation and 1.4 million pursuant to the April conversation) for Hasbro.

Cloud casts doubt on the validity of the oral agreements reached in February and April without explicitly charging that the statute of frauds precludes enforcement of those agreements. In its Response to Hasbro's Proposed Findings and Hasbro's

Supporting Memorandum, Cloud belatedly raised the argument that the purchase orders and acknowledgment copies sent by Hasbro were insufficient to constitute writings in confirmation of a prior oral agreement. Although Cloud is less than explicit on this point, it invokes language from § 2-201(2): "Between merchants if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know of its contents, it satisfies the requirements of subsection (1) against such party unless written notice of objection to its contents is given within 10 days after it is received." 810 ILCS 5/2-201(2). Cloud thus appears to suggest that there was no contract between the parties until some time after Cloud sent its order acknowledgments to Hasbro.

Again, Cloud's argument is puzzling; there can be no real dispute that the parties performed the agreements reached in February and April. Nevertheless, despite conducting its affairs as if it had entered into a contract with Hasbro long before June of 1996, Cloud repeatedly urges that the parties did not reach an agreement until that time, when Cloud first sent its own order acknowledgments to Hasbro. Cloud believes the court must therefore enforce the terms of its own order acknowledgments, the most important of which are the quantity terms. Significantly, however, the UCC's statute of frauds provision would defeat Cloud's effort to enforce its own order acknowledgments against Hasbro. Section 2-201(1) provides: "Except as otherwise provided in this Section a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the

parties *and signed by the party against whom enforcement is sought* or by his authorized agent or broker . . . the contract is not enforceable under this paragraph beyond the quantity of goods shown in such writing." (emphasis added). The commentary clarifies that there are "[o]nly three definite and invariable requirements as to the memorandum. . . . first, it must evidence a contract for the sale of goods; second, it must be 'signed,' a word which includes any authentication which identifies the party to be charged; and third, it must specify a quantity." 810 ILCS § 5/2-201(1), cmt. 1. Hasbro did not sign Cloud's order acknowledgments; therefore, Cloud's order acknowledgments, and more particularly the quantity terms therein, are unenforceable against Hasbro. The only writings sufficient to satisfy the statute of frauds here are Hasbro's purchase orders: they are signed by the party against whom enforcement is sought, (Hasbro), and state a quantity.[22]

## 2. Cloud's Attempted Modification of the Quantity Term

Cloud maintains that if its contract with Hasbro was actually formed during the February and April telephone conversations, the quantity terms of that contract were subsequently modified through its own order acknowledgments. On April 22, 1996, Kathy Esposito called Graham and placed an order for 1,500,000 small packets

---

[22]     Further, the commentary to § 2-201 clarifies what kind of writing is sufficient to remove an oral contract from the statute of frauds: "All that is required is that the writing afford a basis for believing that the offered oral evidence rests on a real transaction." 810 ILCS § 5/2-201, cmt.1. The evidence presented at trial regarding the conversations between the parties in February and April, particularly when paired with the parties' subsequent conduct, leave this court with little doubt that an agreement had been reached; Hasbro's purchase orders are consistent with that agreement and afford a more than adequate "basis for believing that the offered oral evidence rests on a real transaction." Cloud's order acknowledgments, on the other hand, do not afford a basis for believing that Hasbro increased the quantity terms of its order with Cloud.

and 1,403,000 large packets. Almost two months after Hasbro placed its April orders, and a few weeks after Hasbro informed Cloud of the formula change, Cloud, on June 25, 1996, sent Hasbro order acknowledgments for Hasbro's April order. Cloud's order acknowledgments, however, reflected an increase in the contractual quantity of packages it would produce for Hasbro, from 1,504,000 small to 4.5 million small and from 1,403,000 large to 5 million large packages. It is undisputed that Hasbro did not sign Cloud's order acknowledgments. It is also undisputed that no signed writing exists reflecting Hasbro's consent to Cloud's increase of the quantity term.

Section 2-209 of the Illinois Uniform Commercial Code governs modification, recission and waiver of contracts for the sale of goods. *See* 810 ILCS 5/2-209. According to that section, "the requirements of the statute of frauds section . . . (Section 2-201) must be satisfied if the contract as modified is within its provisions." 810 ILCS 5/2-209(3). Thus, the allegedly modified contract, with its increased quantity term, falls squarely within the provisions of the statute of frauds: it is a contract for the sale of goods for more than $500.00. Because § 2-209(3) leads back to § 2-201, however, the analysis of the alleged modification parallels the above statute of frauds analysis regarding the initial contract formation.

The Illinois version of §2-209(3) is identical to the UCC § 2-209(3). There is an ongoing controversy over the correct interpretation of this provision; under the majority view, "all contract modifications must be in writing," while "another view is that only modifications of terms that are required to be in writing under UCC § 2-201 must be in writing." *See Zemco Mfg., Inc. v. Navistar Int'l Transp. Corp.*, 186 F.3d 815, 819 (7th Cir. 1999). Under either of these interpretations, § 2-209(3)'s writing

requirement applies here because the term at issue is a *quantity* term, a term for which there always must be a writing signed by the party to be charged. *See Tuteur Assocs., Inc. v. Taubensee Steel & Wire Co.*, 861 F. Supp. 693, 697-98 (N.D. Ill. 1994). Modification of a quantity term must be evidenced by a writing signed by the party to be charged, in this case Hasbro.

The fact that the disputed term is a quantity term is dispositive; Cloud cannot succeed on a modification theory any more than it could on the theory that the initial contract was for the higher quantity term. Without a writing signed by Hasbro, § 2-209(3) and § 2-201 of the UCC dictate that Cloud's unilateral attempt to modify the quantity term must fail.

### 3.     Attempted modification as waiver of the quantity term

Hasbro did not consent in writing to Cloud's modification of the quantity term, and the attempted modification therefore failed.     Section 2-209(4) of the UCC, however, gives Cloud one more opportunity to show that its increased quantity term controls. That section makes unwritten modifications potentially operative: "[a]lthough an attempt at modification . . . does not satisfy the requirements of [§ 2-209(3)] . . . it can operate as a waiver." 810 ILCS 5/2-209(4). Although it is clear that Hasbro never consented in writing to ordering extra Laponite HB blended packages, Cloud argues that, by its conduct, Hasbro itself attempted to modify the quantity term of the contract and, therefore, waived that term.

The UCC does not explain under what circumstances an attempted modification that does not comply with § 2-209(3) (because it is not in writing) can operate as a waiver. The Seventh Circuit provided guidance on the subject in *Wisconsin Knife*

*Works v. National Metal Crafters*, 781 F.2d 1280 (7th Cir. 1986), a case interpreting

Wisconsin's UCC § 2-209(4), which is identical to Illinois' § 2-209(4). In that case, the

court explained that an attempted modification could only operate as a waiver where

there is reliance that is both reasonably induced and reasonable in extent. *Wisconsin*

*Knife Works,* 781 F.2d at 1287. Whether or not it was entitled to do so, Cloud clearly

relied upon certain of Hasbro's actions and communications, drawing from them the

inference that Hasbro would want and need more Laponite HB packets than it had

ordered. Cloud's reliance, however, could only have been reasonable if Cloud can show

that the acts it relied upon were "clear, unequivocal, and decisive act[s]" manifesting

an intent to waive the quantity term. *See In re Nitz*, 317 Ill. App. 3d 119, 130, 739

N.E.2d 93, 103 (2nd Dist. 2000); *Galesburg Clinic Ass'n v. West*, 302 Ill. App. 3d 1016,

1019, 706 N.E.2d 1035, 1037 (3rd Dist. 1999).[23]

According to Cloud's version of the events, Hasbro's conduct clearly manifested

both an intent to modify, and a belief that it had successfully modified, the quantity

terms of the contract. For example, Cloud highlights the conversation between Kathy

Esposito and Graham that occurred at some point in mid-July 1996 wherein the two

discussed splitting up the production from each of Southern Clay's 18-metric-ton

shipments of Laponite HB into approximately 600,000 small and 600,000 large

packets. Kathy Esposito recited these numbers in an e-mail to Hasbro's Far East

---

[23]     In *American Suzuki Motor Corp. v. Bill Kummer, Inc.* 65 F.3d 1381, 1386
(7th Cir. 1995), the Seventh Circuit approved of the district court's use of Wisconsin
common law to aid in the interpretation of waiver under § 2-209(4) because the case
law interpreting § 2-209(4) in Wisconsin was sparse. Following that lead, because
Illinois case law interpreting § 2-209(4) is similarly sparse, this court relies upon
Illinois common law principles of waiver to interpret § 2-209(4).

office on August 7, 1996, stating that the remaining schedule called for such shipments of 600,000 each of small and large packages monthly for the next six months. Cloud emphasizes that following such a schedule would result in Hasbro's receiving more Laponite HB blended packages than it had initially ordered. Furthermore, on the same day that Kathy Esposito sent this e-mail, Ricci spoke to Sawyer of Southern Clay, urging him to accelerate delivery of the final 54 metric tons of Laponite HB. Sawyer described subsequent communications concerning the delivery schedule in which Ricci told Sawyer that Hasbro expected its requirements for Laponite HB to increase by 50% in 1997.

Cloud also points out that, on a copy of a letter she had received from Sawyer about the delivery schedule, Ricci made notations regarding the outstanding packets to be delivered by Cloud, notations that corresponded with Cloud's June order acknowledgments, rather than Hasbro's purchase orders. Along the same lines, Cloud suggests, is Doane's June 11, 1996 letter to seven other Hasbro employees in which he stated with respect to the formula change, "[t]he two differences that you should notice about the new . . . packets are that they cost less and that there are more of them."

Cloud emphasizes that Doane was not the only Hasbro employee who, at some point in time, believed Hasbro was supposed to receive more packets than it had originally ordered from Cloud. William Esposito testified that he had expected Cloud to package the entire 54 metric ton shipment of Laponite HB for delivery to Hasbro, and furthermore, that he would not have expected Cloud to package only a portion of that shipment and then decline to package the rest. Ricci likewise testified that she

41

expected Cloud to package, for delivery to Hasbro, all of the Laponite HB that was on order from Southern Clay. Also suggesting that Hasbro had waived the quantity terms in the contract because it was trying to get as much Laponite HB as quickly as it could, Cloud contends, is the fact that Hasbro had been searching for an additional supplier of Laponite-type material, and in December of 1996, negotiated a deal whereby Sud Chemie would also produce and package such a material for Hasbro.

The evidence Cloud recites does suggest that Hasbro intended to exceed the quantities of Laponite HB blended packages it had ordered from Cloud in February and April of 1996. This evidence is relevant, however, only if Cloud can show that Hasbro's conduct reasonably induced Cloud to ignore the quantity terms set forth in February and April. Cloud must also demonstrate that its reliance on Hasbro's conduct was reasonable in extent. *See Wisconsin Knife Works*, 781 F. 2d at 1287. Cloud's proffered evidence shows at least that Hasbro was more concerned with prompt product than with the specific terms of its order. Nevertheless, the vast majority of the evidence Cloud emphasizes does not support the proposition that Cloud reasonably relied on Hasbro's conduct when Cloud blended and packaged Laponite HB beyond the contractual quantity terms: most of the evidence Cloud emphasizes is evidence that Cloud uncovered during discovery, after the start of this litigation, and thus, could not have been relied upon by Cloud when it decided that the contractual quantity terms were no longer effective. Any internal communications between Hasbro employees or communications between Hasbro and Southern Clay were communications to which Cloud was not privy. Such communications shed no light on the reasonableness of Cloud's reliance on Hasbro's conduct.

Cloud does point to one piece of evidence[24] that is arguably relevant to the issue of Cloud's reliance: the discussion between Kathy Esposito and Graham, in which she directed Graham to split the production of packages evenly between large and small ones. In that conversation, Kathy did not take issue with the quantity of packages, 600,000 each large and small, that Graham said could be produced when splitting the 18 metric ton shipments evenly. Production of that quantity would greatly alter the amounts set forth in Hasbro's purchase orders. Cloud argues that the conversation supports the conclusion that Hasbro intended to modify or waive the quantity term. The court concludes, however, that this conversation is not sufficient to meet Cloud's burden. Kathy Esposito's direction to split production between large and small packages, and failure to object to Graham's projection of the number of packages such a split would produce, hardly constitutes a "clear, unequivocal and decisive" act on the part of Hasbro signaling its intention to waive the prior contractual quantity terms in favor of the numbers that Graham mentioned to Kathy Esposito. As such, Cloud was not entitled to rely on this exchange to justify its unilateral increase of the quantity terms; Cloud's reliance was neither "reasonably induced," nor "reasonable in extent." *See Wisconsin Knife Works*, 781 F.2d at 1287.

The exchange between Kathy Esposito and Graham is equally susceptible to the

---

[24] Cloud also emphasizes Hasbro's expression of dissatisfaction concerning Southern Clay's failure to provide enough Laponite HB. Cloud understands these expressions of dissatisfaction as evidence that Hasbro wanted more Laponite HB, in absolute terms, rather than just more than it was able to get at the time. For the same reasons that the exchange between Kathy Esposito and Graham was insufficient to support an oral modification of the contract, so too were any references by Hasbro to its dissatisfaction with Southern Clay's production and shipment schedule. Those expressions of urgency about the delivery schedule cannot be understood as a communication to Cloud about the quantity term.

interpretation that Esposito meant for Cloud to produce packages at the rate of 600,000 each large and small until the quantity specified per the contract had been produced. This is consistent with Kathy Esposito's testimony that she did not check Graham's projections against the purchase orders because she assumed he complied with the purchase orders. It is also consistent with Graham's testimony that he did not interpret this conversation to mean that Kathy Esposito was placing any additional orders for Hasbro. Because the communication was not an unequivocal attempt to modify the quantity terms of the contract, Cloud's reliance on the conversation as a modification of the contract was not reasonable.[25]

## CONCLUSION

The origin of this dispute is, in hindsight, obvious. On June 3, 1996, Hasbro initiated a formula change, and Doane's letter instructed Cloud to reduce the amount of Laponite HB in both the large and small packets. Cloud did not object to the formula change; to the contrary, Cloud accepted it and promptly began to recalculate new, lower prices for the packages based on the reduced amount of Laponite HB in each package. The clear result of the formula change was that Cloud had more Laponite HB than it needed to fill the February and April orders. Given Hasbro's repeated message that it could not get enough Laponite HB to fill its needs in timely fashion, Cloud's decision to produce as many packets as possible appeared to be a safe course of action. Cloud was trying to keep pace with Hasbro's Laponite HB needs, a

---

[25] The court notes that, even if the terms from Cloud's own order acknowledgments controlled the transaction, Cloud should have obtained a new purchase order prior to manufacturing quantities in excess of the contract terms; term number three on Cloud's own "terms and conditions" document requires: "Customer must supply a written purchase order at least 5 days prior to a scheduled production."

task made virtually impossible by the length of time it took Southern Clay to fill Cloud's Laponite HB orders.

The fact remains, however, that Cloud could readily have protected itself against any problems resulting from the formula change. Cloud could have pursued its initial unsuccessful attempt to get Hasbro to agree to pay for all excess Laponite. Alternatively, Cloud could have asked Hasbro to generate purchase orders to cover the additional quantities of packages. Had Cloud made such a request and had Hasbro declined it, Cloud might have held firm on the contract price instead of volunteering to lower it. For that matter, Cloud was under no legal obligation to adjust the per-packet price. What the law does not permit Cloud to do under these circumstances was to assume that Hasbro must also have agreed to a modification in the quantity of packages it had ordered. Nor do the Hasbro/Southern Clay communications bolster Cloud's claim of oral modification.

The court enters judgment in favor of Hasbro.

ENTER:

Dated: January 28, 2002

REBECCA R. PALLMEYER
United States District Judge